**ORGANIZED MIGRANTS IN COMMUNITY ACTION, INC., Appellant,**

**Elizabeth Wilder et al.**

v.

**Peter BRENNAN, Secretary, Department of Labor, et al.**

No. 74–2062.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 26, 1975.

Decided Oct. 9, 1975.

Patricia A. Butler, Los Angeles, Cal., with whom Florence Wagman Roisman and Miriam Guido, Washington, D. C., were on the brief for appellants.

Stephen F. Eilperin, Atty., Dept. of Justice, with whom Carla A. Hills, Asst. Atty. Gen., Earl J. Silbert, U. S. Atty., and Michael H. Levin, Washington, D. C., Counsel for App. Litigation, Dept. of Labor, were on the brief for Federal appellees. Barbara L. Herwig, Atty., Dept. of Justice, also entered an appearance for Federal appellees.

Before TAMM and LEVENTHAL, Circuit Judges, and MILLER,* Judge, United States Court of Customs and Patent Appeals.

Opinion for the Court filed by Circuit Judge TAMM.

TAMM, Circuit Judge:

This case involves an alleged conflict of legislation; we must determine

---

* Sitting by designation pursuant to 28 U.S.C. § 293(a).

whether jurisdiction to regulate farmworkers' exposure to pesticides is vested in the Department of Labor or in the Environmental Protection Agency. Appellants Organized Migrants In Community Action, et al.[1] claim that jurisdiction lies with the Department of Labor and that the Secretary must issue regulations pursuant to his authority under the Occupational Safety and Health Act of 1970, 29 U.S.C. §§ 651 et seq. (1970). Appellees Secretary of Labor and Administrator of the Environmental Protection Agency maintain that the Environmental Protection Agency (EPA), which has already issued such regulations pursuant to the Federal Environmental Pesticide Control Act of 1972, 7 U.S.C. §§ 136 et seq. (Supp. III 1973) (FEPCA), has properly exercised its jurisdiction. They claim that the Administrator's actions have eliminated the jurisdiction of the Secretary of Labor. District Judge Hart, by ruling favorably on appellees' 12(b)(6) motion, confirmed the latter view. We agree and hold that EPA has the authority to promulgate rules regulating farmworker exposure to pesticides and by so doing has preempted the Secretary of Labor from acting.

I

In 1970, Congress passed the Occupational Safety and Health Act (OSHA), legislation whose purpose was "to assure so far as possible every working man and woman in the Nation safe and healthful working conditions and to preserve our human resources . . . ." 29 U.S.C. § 651. To accomplish this, the Secretary of Labor was given broad authority to promulgate occupational safety and health standards to protect workers exposed to hazards in their employment. See id. at §§ 652(8), 654, 655. However, Congress recognized that the Secretary's broad authority under OSHA might conflict with other agencies that regulated occupational health and safety. Therefore, section 4(b)(1) of the Act, 29 U.S.C. § 653(b)(1), provides that:

> Nothing in this [Act] shall apply to working conditions of employees with respect to which other Federal agencies . . . exercise statutory authority to prescribe or enforce standards or regulations affecting occupational safety or health.

See Subcommittee on Labor, Senate Committee on Labor and Public Welfare, 92d Cong., 1st Sess., Legislative History of the Occupational Safety and Health Act of 1970 at 997 (Comm. Print 1971) (hereafter Comm. Print). This provision lies at the heart of the current controversy.

This controversy began on May 1, 1973, when, pursuant to 29 U.S.C. § 655(c) of OSHA, the Secretary issued an emergency temporary standard for twenty-one organophosphate pesticides.[2] The standard set field re-entry times— the interval after the application of a pesticide before the expiration of which it is unsafe to enter the field and to come into contact with the vegetation— and served as a proposed rule for the promulgation of a permanent standard. Once the Secretary issued an emergency temporary standard, he was required by section 655(c) to promulgate a permanent standard within six months thereafter.[3] Two months after the Secretary

---

1. Appellants are two organizations dedicated to advancing the conditions of farmworkers, Organized Migrants In Community Action, Inc. and Raza Association of Spanish Surnamed Americans, and an individual farmworker who has suffered toxic exposure to pesticides.

2. 38 Fed.Reg. 10715 (1973). On June 15, the Secretary postponed the application of the standard with the intent to promulgate a new standard to remedy deficiencies observed by several interested groups. 38 Fed.Reg. 15729 (1973). On June 29, the Secretary issued a revised temporary emergency standard establishing generally more lenient field re-entry standards for twelve of the twenty-one pesticides originally included. 38 Fed.Reg. 17214 (1973).

3. The Act states that the temporary emergency standard shall serve as a proposed rule for the proceeding. 29 U.S.C. § 655(c)(3) (1970). Pursuant to the requirements of section 655, the Secretary announced the establishment of a rulemaking, solicited comments, scheduled hearings, and proposed field re-entry standards for nine additional pesticides. 38 Fed. Reg. 17245 (1973).

of Labor issued his temporary emergency standard, the Environmental Protection Agency formally expressed an ·intent to regulate farmworker exposure to pesticides.[4]

Appellants filed this action in district court on January 11, 1974, after the Secretary failed to issue a permanent standard within six months of the issuance of the temporary emergency standard. They sought a declaratory judgment and a mandatory injunction directing the Secretary to issue a permanent standard.[5] Subsequently, upon learning from a draft memorandum of agreement between EPA and the Department of Labor, see App. at 10, that EPA would have primary responsibility for establishing occupational health and safety standards with respect to pesticides, appellants amended their complaint to include the Administrator of EPA and sought additional relief in the form of a declaration that the proposed transfer of responsibility to EPA was in violation of OSHA and an injunction prohibiting the transfer.

On March 11, 1974, EPA published a proposed standard prescribing worker reentry times into fields treated with pesticides. 39 Fed.Reg. 9457 (1974). EPA issued its final standard on May 10, 1974. 39 Fed.Reg. 16888 (1974). On June 12, 1974, appellees moved to dismiss on the ·ground that the complaint failed to state a claim upon which relief could be granted, maintaining that the Secretary of Labor was precluded by section 4(b)(1) of OSHA from issuing regulations in light of EPA's actions. Appellants moved for summary judgment, claiming that the

Secretary was not preempted from issuing regulations to control farmworker exposure to pesticides and, indeed, was obligated to do so. Appellees, then, cross-moved for summary judgment, again claiming that the Secretary could not issue such regulations. After a hearing, District Judge Hart granted appellees' motion to dismiss and appellants appealed.

On appeal, appellants argue that the Secretary of Labor was not precluded from issuing regulations to protect farmworker exposure to pesticides because EPA did not have statutory authority to issue such regulations and because Congress did not intend to preempt OSHA jurisdiction by enacting FEPCA. We consider these contentions *seriatim.*

II

Appellants first argue that EPA did not preempt the Secretary of Labor from issuing regulations to protect farmworkers from occupational exposure to pesticides because EPA does not possess "statutory authority to prescribe or enforce standards or regulations affecting occupational safety or health." 29 U.S.C. § 653(b)(1). Recognizing that EPA claims its authority from the Federal Environmental Pesticide Control Act, appellants assert that a "careful scrutiny of the statutory language demonstrates that [FEPCA] was not written to regulate employee health or safety. Furthermore, the legislative history of its enactment illustrates the fact that it was not intended to do so." Appellant's Br. at 9.

---

4. 38 Fed.Reg. 20362 (1973). EPA's notice announced a series of hearings and contained a proposed rule for comment. EPA also noted the concurrent hearings to be held by the Secretary of Labor and announced that its final standards would be based on the records made by both agencies. *Id.* at 20362–63.

5. Several grower associations had challenged the temporary emergency standard in the Fifth Circuit. Unbeknownst to appellants, the Fifth Circuit, two days before suit was filed in the case *sub judice,* vacated the temporary emergency standard on the ground that no substan-

tial evidence supported the Secretary's determination that an emergency existed within the meaning of the Act. *Florida Peach Growers Ass'n, Inc. v. United States Dep't of Labor,* 489 F.2d 120 (5th Cir. 1974). Therefore, appellants amended their complaint to allege that the Secretary had failed to issue a permanent standard or to determine that a standard should not be issued within sixty days of the close of hearings. 29 U.S.C. § 655(b)(4) (1970). *This amendment did not change the thrust of appellants' complaint.*

■ We find appellants' "careful" reading of FEPCA entirely unpersuasive; it ignores significant parts of the Act and its legislative history. Our own analysis of the statute and its legislative history confirms EPA's ample statutory authority to issue field re-entry standards to protect farmworkers.

FEPCA is a comprehensive revision of the Federal Insecticide, Fungicide and Rodenticide Act (FIFRA), 7 U.S.C. §§ 135 *et seq.* (1970). While FEPCA retains the character of its predecessor, it contains a number of innovations to direct and strengthen federal control over pesticides. FEPCA makes clear that the purpose of federal pesticide regulation is to protect man and his environment, *see* 7 U.S.C. § 136(bb), and it extends the reach of the federal power to include intrastate activities that affect commerce. *See id.* at § 136a(a). Significantly for our purposes, FEPCA, for the first time, regulates pesticide *use,* and makes misuse civilly and criminally punishable. *See id.* at 136j, *l.*

FEPCA retains pesticide registration and labeling as its key mechanisms. The Act requires pesticides to be registered with the EPA, 7 U.S.C. § 136a, j, once the Administrator finds that:

(A) its composition is such as to warrant the proposed claims for it;

(B) its labeling and other material required to be submitted comply with the requirements of [the Act];

(C) it will perform its intended function without unreasonable adverse effects on the environment; and

(D) when used in accordance with widespread and commonly recognized practice it will not generally cause unreasonable adverse effects on the environment.

*Id.* at § 136a(c)(5). Notably, "unreasonable adverse effects on the environment" is defined in the Act as "any unreasonable risk to *man* or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." *Id.* at § 136(bb) (emphasis added).

When registering a pesticide, the Administrator may classify it or certain of its uses as restricted where he finds that its use "may generally cause, without additional regulatory restrictions, unreasonable adverse effects on the environment, including injury to the applicator . . .." *Id.* at § 136a(d)(1)(C). Where a pesticide is classified as restricted because it is toxic to the applicator, it must be applied "by or under the direct supervision of a certified applicator."[6] 7 U.S.C. § 136a(d)(1)(C)(i). If the pesticide is restricted because of potential harm to the environment, a certified applicator must apply or supervise the pesticide's application, and the Administrator may impose additional restrictions by regulation. *Id.* at § 136a(d)(1)(C)(ii).

The labeling requirements of the Act also provide a significant measure of protection. As noted above, the Administrator must determine that a pesticide will be properly labeled before its registration, and the Act makes it unlawful to distribute in any way a misbranded pesticide. *Id.* at § 136j(a)(1)(E). Under the Act's definitions, a pesticide is misbranded if "the labeling accompanying it does not contain directions for use which . . . if complied with . . . are adequate to protect health and the environment." *Id.* at § 136(q)(1)(F). Moreover, the Act makes it unlawful for any person "to use any registered pesticide in a manner inconsistent with its labeling." *Id.* at § 136j(a)(2)(G).[7] Thus FEPCA requires that pesticides contain instructions on their use to protect health and also has enforcement mechanisms to en-

---

**6.** 7 U.S.C. § 136(e)(1) provides that: "The term 'certified applicator' means any individual who is certified under section 136b of this title as authorized to use or supervise the use of any pesticide which is classified for restricted use." 7 U.S.C. § 136b allows the Adminis-

trator to promulgate certification standards or to approve state certification programs.

**7.** Criminal penalties for violation of FEPCA's provisions range to a maximum of one year's imprisonment and a fine of $25,000. 7 U.S.C. § 136*l*(b)(1).

sure that these instructions will be followed.

Even before FEPCA's enactment, EPA and predecessor agencies construed the labeling provisions of FIFRA to require field re-entry limitations for many pesticides. *See* 39 Fed.Reg. 16888 (1974). However, these were merely informational until FEPCA made them enforceable. *See id.* at 16889. It is clear from an examination of the explanatory statement accompanying EPA's proposed and final rules that these standards were promulgated and implemented under the labeling authority given EPA by FEPCA.[8]

The Act's legislative history buttresses our conclusion that Congress meant to give EPA authority to regulate farmworker exposure to pesticides. Since we discuss FEPCA's legislative history more fully *infra*, we will only note here that both the Senate Commerce Committee and Agriculture and Forestry Committee engaged in an extensive colloquy over whether to include specific language in FEPCA indicating that farmworkers were protected. While the Commerce Committee thought that specific language would further the Act's purposes and the Agriculture and Forestry Committee did not, both Committees agreed that farmworkers were among the beneficiaries of the Act, even without specific language to that effect. *Compare S.Rep.No.92–970*, 92d Cong., 2d Sess. at 27 (1972) (Commerce) *with S.Rep.No.92–838* (Part II), 92d Cong., 2d Sess. at 43–46 (1972) (Agriculture and Forestry), U.S.Code Cong. & Admin.News 1972, p. 3993. In sum, EPA had ample statutory authority to promulgate and enforce occupational health and safety standards for farmworkers.

### III

Appellants also claim that even if EPA possesses statutory authority to set field re-entry standards, section 4(b)(1)

of OSHA should not be construed to prohibit the Secretary of Labor from issuing and enforcing his own standards. To support this claim, appellants point to the legislative history of the two acts, maintaining that farmworker protection was one of OSHA's primary purposes. In contrast, appellants characterize the legislative history of FEPCA as evincing no more than an incidental interest in protecting farmworkers from exposure to pesticides. Next, appellants argue that the purpose of OSHA would be frustrated if FEPCA were construed to preempt the jurisdiction of the Secretary. Finally, appellants rely on a decision of the Occupational Safety and Health Review Commission which they maintain supports this approach.

■ Section 4(b)(1), set out in Part I, is seemingly clear on its face; the Secretary has no jurisdiction to promulgate or enforce occupational safety and health standards for particular employee working conditions where another federal agency is exercising statutory authority over those conditions. Appellants would have us look beyond the plain meaning of this language to discern a contrary legislative intent.

■ We recognize that the plain meaning of a statute cannot override an obviously contrary legislative purpose, *Portland Cement Association v. Ruckelshaus*, 158 U.S.App.D.C. 308, 486 F.2d 375, 379–80 and n.13 (1973); *Wilderness Society v. Morton*, 156 U.S.App.D.C. 121, 479 F.2d 842, 855 (*en banc*), *cert. denied*, 411 U.S. 917, 93 S.Ct. 1550, 36 L.Ed.2d 309 (1973), for "even the most basic general principles of statutory construction must yield to clear contrary evidence of legislative intent." *National Railroad Passenger Corp. v. National Association of Railroad Passengers*, 414 U.S. 453, 458, 94 S.Ct. 690, 693, 38 L.Ed.2d 646 (1974). We are also cognizant that a statute's "literal meaning will not be followed when it appears that to do so

---

**8.** *See* 39 Fed.Reg. 16888–89 (1974); 38 Fed. Reg. 20362–63 (1973). *See also* 7 U.S.C. § 136w (Supp. III 1973). The regulations promulgated by EPA to protect farmworkers from toxic exposure to pesticides are found at 40 C.F.R. § 170.1 *et seq.* (1974).

would, in view of the purpose of the statute, lead to an absurd or unjust result." *Saginaw Broadcasting Co. v. FCC*, 68 App.D.C. 282, 96 F.2d 554, 558 (1938). Nevertheless, we cannot find even a glimmer in OSHA's legislative history that Congress did not mean what it said in section 4(b)(1); nor can we infer from FEPCA and its legislative history an intention not to preempt the Secretary of Labor. Finally, we do not believe that the result reached here in any way frustrates OSHA's purpose.

Undeniably, one of the major concerns that prompted OSHA's enactment in 1970 was the occupational hazard presented by the misuse of pesticides. *See* 116 Cong.Rec. 37628 (1970) (Statement of Senator Nelson); *id.* at 37325 (Statement of Senator Williams). Nevertheless, there is another clearly enunciated legislative intent which is manifest in section 4(b)(1). While giving the Secretary omnibus authority to regulate occupational safety and health, Congress sought to avoid the wasteful duplication that would result where another federal agency was also providing for the occupational safety of a class of workers. The Senate Report on its version of OSHA, which contained an analogue to the present section 4(b)(1), stated that the bill

does not modify other Federal laws prescribing safety and health standards. The bill does not authorize the Secretary of Labor to assert authority under this bill over particular working conditions regarding which another Federal agency exercises statutory authority to prescribe or enforce standards affecting occupational safety and health.

*S.Rep.No.*91–1282, 91st Cong., 2d Sess. at 22 (1970) U.S.Code Cong. & Admin.News 1970, pp. 5177, 5199. The House Labor Committee, reporting on a bill similar to the final version observed that "[t]he Committee does not wish the Secretary of Labor to assert his statutory authority under this bill where another agency or department is actually exercising its authority." *H.Rep.No.*91–1291, 91st

Cong., 2d Sess. at 34 (1970). Similarly, in recommending the Conference Report on the floor of the House, Representative Steiger noted that the "terms of the bill will apply to all businesses having an effect on Commerce except where another Federal agency other than the Department of Labor is exercising statutory authority to prescribe or enforce occupational safety and health standards or regulations." 116 Cong.Rec. 42206 (1970). Throughout OSHA's legislative history we have found numerous other statements that support appellees' position and none that support appellants'. Comm. Print, *supra*, at 308, 997, 1019, 1037, 1204.

As to the effect of future legislation on the Secretary's jurisdiction, Representatives Erlenborn and Daniels expressed mildly divergent views in the following exchange during the House debate:

Mr. Erlenborn. There is one other situation where there is no present statutory authority, but subsequent to this bill becoming law, statutory authority is enacted and then the exercise of that authority comes into play: Would that then exempt an industry?

Mr. Daniels of New Jersey. I think it would depend upon the language employed in that future statute as to what was the intent of Congress. Would it be the intent to Congress that that particular industry should be exempt from the provisions of this bill, or shall we place all safety standards under one authority; namely, as provided in this particular bill?

Mr. Erlenborn. I would suspect that if there were separate authority enacted in the future, it would be clearly the intent of Congress that that separate authority would apply rather than the present authority, else legislative enactment would be a waste of time.

Mr. Daniels of New Jersey. I would say it would depend upon the intent of Congress at that particular moment. 116 Cong.Rec. 38382 (1970). Under one view, a future legislative enactment

would automatically preempt OSHA jurisdiction unless a contrary intent was shown; under the other, a more definite legislative intent must be discerned. However, even under the latter view, Representative Daniels recognized that the intent of Congress would be either to have the working conditions regulated by the Department of Labor or by another federal agency, but not by both.

Neither interpretation of the effect of subsequent legislation aids appellants' cause for it is absolutely clear that by enacting FEPCA Congress intended to vest EPA with authority over farmworker exposure to pesticides. FEPCA requires the Administrator to register pesticides only after he determines that they will not pose unreasonable risks to man and the environment. The Administrator also can place restrictions on a pesticide's use. Further a pesticide's labeling must be adequate to protect man and the environment, and a person who fails to comply with the instructions for application, thereby exposing farmworkers to danger, can be held civilly and criminally responsible.

The Senate Commerce Committee, which considered FEPCA along with the Agriculture Committee, sought amendments which would have, *inter alia*, explicitly included farmworkers as objects of the Act's protections. However, it was forced to admit that "the Committee on Commerce agrees with the Environmental Protection Agency and the Committee on Agriculture and Forestry that the health of farmworkers will be considered without the amending language . . . ." *S.Rep.No.*92–970, *supra*, at 27, U.S.Code Cong. & Admin. News 1972, p. 4111. Moreover, the Commerce Committee stated that only one of its changes, not relevant here, was substantive, thus reinforcing that farmworkers were beneficiaries of the Act's protections even without the proposed changes. *Id.* The Agriculture and Forestry Committee, which had favorably reported the bill to the Senate without the amendments proposed by the Commerce Committee, prepared a report that

opposed them. Appellants maintain that the Agriculture Committee did so because it was not interested in protecting farmworkers. Appellants' Br. at 13. However, we find a contrary intent in the following passages:

> The Committee on Agriculture and Forestry rejected [the Commerce Committee] amendment as surplusage. The entire purpose of the bill is to protect man and the environment. There is no question but that farmers and others coming in contact with pesticides or residues fall within the category man. The Committee on Agriculture and Forestry, at page 14 of Report No. 92–838, took occasion to emphasize that the bill requires the Administrator to require that the labeling and classification of pesticides be such as to protect farmers, farmworkers, and others coming into contact with pesticides or pesticide residues . . . . .

*S.Rep.No.*92–838 (Part II), *supra*, at 43, U.S.Code Cong. & Admin.News 1972, p. 4063. The Committee then continued:

> The bill . . . provides complete safeguards to protect farmers and others coming into contact with pesticides or residues. It does so in general terms that are very broad and cover much more than would be covered by the proposed amendments. The committee felt that by specifically mentioning particular areas protected by the general provisions, there might be some suggestion that the general provisions might be construed to cover less than actually intended. . . .
> The committee believes there can be no question about the matter, but takes this occasion to emphasize that the bill requires the Administrator to require that the labeling and classification of pesticides be such as to protect farmers, farmworkers, and others coming in contact with pesticides or pesticide residues.

*Id.* at 43–44, U.S.Code Cong. & Admin. News 1972, p. 4063. Lastly, the Committee observed that: "The farmer and the farmworker are the persons most likely

to be adversely and immediately affected by pesticides and *they are the most obvious object of the bill's protection.* If there is any question as to whether they are fully protected, we do not know what it could be." *Id.* at 44, U.S.Code Cong. & Admin.News 1972, p. 4063 (emphasis added). Thus, while FEPCA was enacted without the amendments proposed by the Commerce Committee, the legislative history clearly indicates that the amendments were considered an unnecessary addition to the farmworker protection already provided. Since Congress intended that EPA have jurisdiction to regulate farmworker exposure to pesticides, and since the Administrator is exercising that authority, the Secretary of Labor is prohibited from acting.

We cannot find any frustration of congressional purpose in this holding. EPA has and is continuing to develop an expertise concerning the effects of pesticides that would be wasteful to duplicate. Moreover, the area is fraught with a number of conflicting interests that must be balanced. For example, a pesticide might not be dermally or nasally toxic, thus not presenting a hazard to farmworkers, but could be extremely toxic to other living things. In contrast to the Administrator, the Secretary has no authority to resolve such conflicts.

The final prop in appellants' argument is that the Occupational Health and Safety Review Commission, which hears appeals from employers who have been cited for violating OSHA, has interpreted section 4(b)(1) in *Fineberg Packing Co., Inc.,* 7 OSAHRC 405 (1974), to preempt the Secretary's jurisdiction only where the allegedly preempting statute was passed *primarily* for the protection of employees. Appellants have misperceived the significance of that case. The Commission concluded in *Fineberg* that the Wholesome Meat Act did not preempt OSHA because "[t]here is no indi-

cation that employees in the workplace are within the class which Congress sought to protect under the statute." *Id.* at 406. However, if the point were material, the legislative history of FEPCA demonstrates that farmworkers "are the most obvious object of the bill's protection." [9]

## IV

We are cognizant that exposure to pesticides presents a serious health hazard to the nation's farmworkers and believe that they are entitled to the full measure of protection. We do not hold today that farmworkers are without protection from the hazards posed by pesticide exposure, but rather that Congress, by passing the Federal Environmental Pesticide Control Act, endowed the EPA with the authority to provide that protection. Once the Administrator exercised EPA's authority, the Secretary could not duplicate his efforts.

At oral argument, the court asked if this suit had been brought because appellants thought that EPA's enforcement authority was not sufficient when compared to the Secretary's authority under OSHA. Our question elicited an affirmative response. While OSHA's enforcement powers are indeed broad, *see generally National Realty and Construction Co., Inc. v. Occupational Safety and Health Review Comm.,* 160 U.S.App.D.C. 133, 489 F.2d 1257 (1973), the Administrator too has comprehensive authority to ensure that pesticides are properly used. He may investigate potential violations, 7 U.S.C. § 136b, issue stop-use orders, *id.* at § 136k(a), initiate seizure proceedings, *id.* at § 136k(b), and institute civil and criminal proceedings, *id.* at § 136*l.* Most recently, EPA established a pesticide hotline to receive reports of misuse.[10] If, in the future, the enforcement provisions of FEPCA are found to be inadequate, we are confident that

---

9. Appellants' interpretation of *Fineberg Packing Co.* also appears to be inconsistent with the Commission's interpretation of section 4(b)(1) in other cases. *Compare Mushroom Transportation Co., Inc.,* 5 OSAHRC 1588

(1973); *Ruan Transport Corp.,* 3 OSAHRC 364 (1973).

10. 40 Consumer Reports 464 (August, 1975). The nationwide toll-free telephone number, now abandoned, was 800–424–1173.

Congress stands ready to rectify the situation.[11] However, the decisions to be made are legislative rather than judicial, and properly remain the Congress' province.

*Affirmed.*

11. The sole issue presented in this case is the statutory authority of the Secretary of Labor to issue standards regulating agricultural employee exposure to pesticides. Although the difference in enforcement powers available to EPA and the Department of Labor under their respective statutes may have motivated this suit, the parties before us did not address the separate issue of whether, consistent with Congressional interest, EPA and the Department of Labor may agree that the Department of Labor will exercise its OSHA enforcement powers in conjunction with and reenforcement of EPA's exercise of its statutory authority. We therefore do not decide the validity of the provision for mutual enforcement of EPA's standards as anticipated in the DOL/EPA Draft Agreement.

The "Environmental Protection Agency Draft Memorandum of Agreement Regarding Agricultural Workers Protection Standards for Pesticides" (Nov. 1, 1973, J.A. 10) provides: "EPA will enforce these standards in accordance with the FIFRA and applicable regulations thereto. DOL may assist in this enforcement after adopting these standards as DOL standards. While enforcement authority under the FIFRA and the OSHA is not identical, DOL standards and enforcement shall not conflict with those of EPA."