**COLUMBIA GAS OF PENNSYLVANIA, INC., Petitioner,**

v.

**Ray MARSHALL, Secretary of Labor, and Occupational Safety and Health Review Commission, Respondents.**

No. 80–1459.

United States Court of Appeals, Third Circuit.

Argued Oct. 14, 1980.

Decided Dec. 23, 1980.

Rehearing Denied Feb. 20, 1981.

Jane A. Lewis (argued), Carl H. Hellerstedt, Jr., Thorp, Reed & Armstrong, Pittsburgh, Pa., Thomas J. Brown, Jr., Thomas E. Morgan, Columbus, Ohio, for petitioner.

Thomas L. Holzman (argued), Allen H. Feldman, Jeffrey M. Strashun, Anthony J. Steinmeyer, Marleigh Dover Lang, Carin A. Clauss, John Hynan, Marshall Harris, Washington, D. C., for respondent.

Before HUNTER and WEIS, Circuit Judges, and FISHER,* District Judge.

## OPINION OF THE COURT

JAMES HUNTER, III, Circuit Judge.

Petitioner, Columbia Gas of Pennsylvania, Inc., seeks dismissal of a citation issued by the Occupational Health and Safety Administration (hereinafter "OSHA"). The citation resulted from the July 27, 1978 inspection of a trench in which petitioner's employees were working on a natural gas pipeline. Columbia contends, *inter alia*, that OSHA was without authority to act because safety regulations issued by the Department of Transportation preempted their jurisdiction. We agree and therefore vacate the citation and the Commission's order for lack of jurisdiction.

---

* Honorable Clarkson S. Fisher, Chief Judge, United States District Court for the District of New Jersey, sitting by designation.

1. The trench was five to seven feet deep. In addition, petitioners were found in violation of 29 C.F.R. § 1926.652(c) (1979) which requires supports to be placed on the sides of trenches greater than five feet deep. Columbia did not contest this citation and therefore it has become a final order of the commission, not sub-

## FACTS

In the summer of 1978 Columbia was installing an auxiliary natural gas pipeline to provide additional service to consumers on Neville Island, Pennsylvania. To expose the existing gas main petitioner excavated a thirty-five foot long trench and Columbia employees used electric and acetylene welding equipment to tap the existing pipeline.[1] By this process natural gas was supplied to the auxiliary pipeline without interrupting the gas flow in the existing main. This procedure—known in the industry as a "hot tap"—is required if an auxiliary line is to be joined to an existing main without disrupting the flow of natural gas to consumers.

Since the use of welding equipment in the "hot tap" creates the risk of explosion if natural gas is also present, petitioner tested the atmosphere of the trench. This test can detect levels of both natural and methene gas. Petitioner's employees performed it once, at the time the trench was first excavated. The results were negative.

On July 26, 1978, a week after the atmospheric testing, one of petitioner's employees smelled natural gas in the trench while working on the hot tap.[2] No atmospheric tests were performed at that time. The next day, compliance officer Ralph Romano, conducted an OSHA inspection of the workplace. He performed no atmospheric tests during the inspection, and none of petitioner's employees detected the odor of natural gas when working in the trench. Nevertheless officer Romano found "gaseous conditions" present and cited petitioner for a serious violation of 29 C.F.R. § 1926.651(v) (1980). This regulation requires atmospheric testing of the trench prior to the use of equipment that could cause accidental ignition.[3]

---

ject to review by any court or agency. 29 U.S.C. § 659(a) (1976).

2. Natural gas is odorized so that it may be detected, even by the public, at twenty percent of its lowest combustible level. (Hearing Transcript at 61).

3. 29 C.F.R. § 1926.651(v) (1980) provides:

(v) In locations where oxygen deficiency or gaseous conditions are possible, air in the

Columbia Gas contested the citation and a hearing was held before an Administrative Law Judge. The ALJ affirmed the findings of officer Romano and upheld the citation. After adjusting the penalty to account for Columbia's prior history and good faith, the ALJ imposed a $420.00 fine. Columbia applied to the Occupational Safety and Health Review Commission (hereinafter "Commission") for discretionary review, contending that regulations of the Department of Transportation preempted OSHA's subject matter jurisdiction over the welding of natural gas pipelines.[4] The Commission declined review; petitioner sought relief in this court.

*SECTION 4(b)(1) PREEMPTION*

Section 4(b)(1) of the Occupational Safety and Health Act, 29 U.S.C. § 653(b)(1) (1976), (hereinafter the "Act") provides:

Nothing in this chapter shall apply to working conditions of employees with respect to which other Federal agencies, and state agencies acting under section 2021 of Title 42, exercise authority to prescribe or enforce standards or regulations affecting occupational safety and health.

■ Read literally, section 4(b)(1) deprives OSHA of jurisdiction over working conditions that are already subject to safety regulations promulgated by other agencies.[5] The clear legislative purpose of this section was to eliminate any wasteful duplication in the efforts of federal agencies.[6]

■ As interpreted since its enactment, section 4(b)(1) preemption requires a two-part showing; first, that a coordinate federal agency has "exercised" authority by promulgating regulations in the area and second, that these concurrent regulations

---

excavation shall be tested. Controls, as set forth in Subparts D and E of this part, shall be established to assure acceptable atmospheric conditions. When flammable gases are present, adequate ventilation shall be provided or sources of ignition shall be eliminated. Attended emergency rescue equipment, such as breathing apparatus, a safety harness and line, basket stretcher, etc., shall be readily available where adverse atmospheric conditions may exist or develop in an excavation.

4. Columbia had two other claims: one, that the cited regulation was unenforceably vague and two, that the violation was not supported by substantial evidence. Because we find OSHA lacked jurisdiction over the workplace at issue we do not address these claims.

5. This interpretation parallels that of the District of Columbia Circuit in *Organized Migrants in Community Action, Inc. v. Brennan*, 520 F.2d 1161, 1166 (D.C.Cir.1975): "Section 4(b)(1), set out in Part I is seemingly clear on its face; the Secretary has no jurisdiction to promulgate or enforce occupational safety and health standards for particular employee working conditions where another federal agency is exercising statutory authority over those conditions." *Id.*

6. Both Congressional reports and case law supports this interpretation. The Senate Report which contained an analogue to the present section 4(b)(1) stated that the bill

does not modify other Federal laws prescribing safety and health standards. The bill does not authorize the Secretary of Labor

to assert authority under this bill over particular working conditions regarding which another Federal agency exercises statutory authority to prescribe or enforce standards affecting occupational safety and health.

S,Rep.No.91–1282, 91st Cong., 2d Sess. 22 *reprinted in*, [1970] U.S.Code Cong. & Ad. News, pp. 5177, 5199.

The House Labor Committee, reporting on a bill similar to the final version observed that "[t]he Committee does not wish the Secretary of Labor to assert his statutory authority under this bill where another agency or department is actually exercising its authority." H.Rep.No. 91–1291, 91st Cong., 2d Sess. 34 (1970). Similarly, in recommending the Conference Report on the floor of the House, Representative Steiger noted that the "terms of the bill will apply to all business having an effect on commerce except where another federal agency other than the Department of Labor is exercising statutory authority to prescribe or enforce occupational safety and health standards or regulations." 116 Cong.Rec. 42206 (1970).

This desire to avoid legislative overlap has been recognized and followed in prior cases. *See, e. g., Taylor v. Moore-McCormick Lines, Inc.* 621 F.2d 88, 91 (4th Cir. 1980) (purpose of § 4(b)(1) was "to eliminate any duplication in the efforts of federal agencies to secure the well being of employees"); *Marshall v. Northwest Orient Airlines, Inc.*, 574 F.2d 119, 122 (2d Cir. 1978); *Organized Migrants in Community Action, Inc. v. Brennan*, 520 F.2d 1161, 1166–68 (D.C.Cir.1975).

cover the specific "working conditions" purportedly within OSHA's jurisdiction.[7] The Department of Transportation, Office of Pipeline Safety (hereinafter OPS), has exercised its authority in this area by promulgating regulations entitled "Transportation of Natural and Other Gas by Pipeline: Minimum Federal Safety Standards." At issue in this case is whether the specific regulation—prevention of accidental ignition, 49 C.F.R. § 192.751 (1980)—envisions the working conditions faced by petitioner's employees when they performed a "hot tap" on the existing gas main. We believe this OPS regulation provides safety standards for the exact conditions of this case and hence find that section 4(b)(1) preempted OSHA's authority over the matter.

7. The preempting agency must actually promulgate regulations, mere declaration of authority over the area is not enough. As the Fourth Circuit stated in *Southern Railway Company v. OSHRC*:

> While Section 4(b)(1) may not be entirely self-defining, it is clear that the exemption applies only when another Federal agency has actually exercised its statutory authority. It does not apply where such an agency has regulatory authority but has failed to exercise it. This is clear not only from the statutory language but from the legislative history as well. Earlier versions of the legislation had provided that the mere existence of statutory authority in another Federal agency was sufficient to invoke the exemption, but they were rejected by the Congress. See Legislative History of the Occupational Safety and Health Act of 1970, pp. 62, 620, 671, 710 (Committee Print, 1971) (Legislative History). That actual exercise of the statutory authority rather than its mere existence was contemplated is clearly evident from the following colloquy during debate on the Act in the House of Representatives:
> "MR. ERLENBORN.
> .    .    .    .    .
> If there is authority under the Federal law, but it has [not] yet been put into effect and it is not being exercised by the executive agency because they have no rules or regulations, then until they do adopt rules and regulations and exercise that authority—then this does apply; is that correct?
> MR. DANIELS of New Jersey. Yes, that would be correct. The gentleman has placed his finger on the key word—and the key word is 'exercise.'
> If an agency fails to pursue the law and exercise the authority that has been given to it, then this law will step in.

■ Whether the OPS regulations cover the worksite of Columbia's employees in this case requires an interpretation of the section 4(b)(1) term "working conditions." In *Southern Railway Company v. OSHRC*, 539 F.2d 335 (4th Cir.), *cert. denied*, 429 U.S. 999, 97 S.Ct. 525, 50 L.Ed.2d 609 (1976), the fourth circuit addressed this issue in order to determine whether the Federal Railroad Administration (hereinafter "FRA") safety regulations concerning railroad transportation preempted OSHA's jurisdiction over the safety of railroad repair shops. In ruling that the FRA regulations did not preempt OSHA's authority the court defined "working conditions" as the "environmental area in which an employee customarily goes about his daily tasks."[8] We adopt this definition.

> MR. ERLENBORN. In other words, the mere existence of statutory authority does not exempt an industry? It is the exercise of that authority pursuant to the statute that does exempt it; is that correct?
> MR. DANIELS of New Jersey. That is correct." Legislative History, p. 1019.

539 F.2d 335, 336–37 (4th Cir.), *cert. denied*, 429 U.S. 999, 97 S.Ct. 525, 50 L.Ed.2d 609 (1976). In Southern Railway, the fourth circuit held that safety regulations issued by the Federal Railroad Administration covering signal inspection and hours of service did not preempt OSHA coverage of railroad repair shop facilities. *See also Marshall v. Nichols*, 486 F.Supp. 615, 619 (E.D.Tex.1980) (Coast Guard regulations preempt OSHA standards for employees on offshore oil platforms—court states an "actual exercise of authority to govern working conditions by the Coast Guard displaces a potential OSHA jurisdiction over offshore platform working conditions.")

8. *Southern Railway*, 539 F.2d 335, 339 (4th Cir.), *cert. denied*, 429 U.S. 999, 97 S.Ct. 525, 50 L.Ed.2d 609 (1976). To reach this definition the Southern Railway court relied on the Supreme Court's definition of "working conditions" as used in the Equal Pay Act of 1963:

> [T]he element of working conditions encompasses to subfactors: "surroundings" and "hazards." "Surrounding" measures the elements, such as toxic chemicals or fumes, regularly encountered by a worker, their intensity and their frequency. "Hazards" takes into account the physical hazards regularly encountered, their frequency, and the severity of injury they can cause. This definition of working conditions is . . . well accepted across a wide range of American Industry.

If "environmental area" covers anything, it covers the discrete work site of a trench in which employees are repairing a pipeline. At the administrative hearing, the ALJ noted petitioner's employees risked accidental explosion from escaping natural gas as well as the accumulation of odorless methene gas.[9] The ALJ also found that while the presence of natural gas could be detected by smell, atmospheric testing is required to determine the level of methene gas. Although these gases present risk of serious harm to petitioner's employees, they existed within the "environmental area" that is the subject of the pipeline safety regulations. Hence, the Office of Pipeline Safety regulations apply; and the general safety standard of OSHA is preempted by section 4(b)(1).

Our conclusion on section 4(b)(1) preemption is buttressed by the language of the preemptory regulation. The introductory sentence of 49 C.F.R. § 192.751 (1980) states: "Each operator shall take steps to minimize the danger of accidental ignition of gas in any structure or area where the presence of gas constitutes a hazard of fire or explosion...."[10] This language covers the risks from both natural and methene gas and applies directly to the performance of a "hot tap" on an existing gas main.

Prior decisions of the Commission further support the finding of section 4(b)(1) preemption. In *Secretary v. Texas Eastern Transmission Corporation*, 20 OSAHRC 712 (1975), the Commission found that a similar pipeline regulation preempted OSHA's jurisdiction over the transfer of liquefied natural gas. In so doing, the Commission examined the history of pipeline regulations and noted that the purpose of the pipeline safety regulations paralleled that of OSHA.[11]

*Corning Glass Works v. Brennan*, 417 U.S. 188, 202, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974).

In *Southern Pacific Transportation Co. v. Usery*, 539 F.2d 386 (5th Cir. 1976) *cert. denied*, 434 U.S. 874, 98 S.Ct. 222, 54 L.Ed.2d 154 (1977) the fifth circuit also addressed the question of what constitutes a "working condition" under section 4(b)(1). Also relying on the court's *Corning Glass* discussion, the fifth circuit developed a more fluid definition: "[T]he statutory term 'working conditions' embraces both 'surroundings', such as the general problem of the use of toxic liquids, and physical 'hazards,' which can be expressed as a location (maintenance shop); a category (machinery); or a specific item (furnace)." *Southern Pacific*, 539 F.2d 386, 391 (5th Cir. 1976). We appreciate the desire for flexibility in a definition of working conditions, but adopt the Southern Railway "environmental area" test because it might afford the employer greater notice of what areas are subject to OSHA regulation and what areas are covered by other administrative regulations.

9. The ALJ found that a dangerous accumulation of methene gas could have existed in the trench. Methene gas can develop from the decomposition of sewage and the ALJ stated: "There was a possibility that methene gas could filter through the soil and into this excavation...." ALJ Finding of Fact No. 6.

10. 49 C.F.R. § 192.751 (1980). The entire regulation states:

§ 192.751 Prevention of accidental ignition.
    Each operator shall take steps to minimize the danger of accidental ignition of gas in any structure or area where the presence of gas constitutes a hazard of fire or explosion, including the following:
    (a) When a hazardous amount of gas is being vented into open air, each potential source of ignition must be removed from the area and a fire extinguisher must be provided.
    (b) Gas or electric welding or cutting may not be peformed on pipe or on pipe components that contain a combustible mixture of gas and air in the area of work.
    (c) Post warning signs, where appropriate.

11. In *Texas Eastern* the Commission noted:
    Review of the background and need for the creation in the Department of Transportation of an Office of Pipeline Safety reveals concerns remarkably similar to those prompting occupational safety and health legislation.
    Thus, in the summary to the House Report that accompanied the enacted bill it was noted that: "[T]he accident record of the industry has been a spotty one. In certain areas it has been good; in other areas, statistics are lacking but many illustrations can be given of unfortunate and disastrous failures.
    Present regulation by State Commissions is varied and indeed there is difficulty in determining the effectiveness of State enforcement inasmuch as many of the States only recently have prescribed safety standards." H.R.Rep.No.1390, 90th Cong. 2nd Sess. (1966); U.S.Code Cong. and Ad. News 3232 (hereinafter House Report.)
    In reaction to these problems Congress passed the Natural Gas Pipeline Safety Act of 1968 creating within the Department of Transportation, the Office of Pipeline Safety.

While the regulation in *Texas Eastern*, 49 C.F.R. § 192.12(b)(2), is not at issue in this case, the Commission's recognition that the policies underlying the OPS regulations are identical to those of OSHA allays any fear that gaps in the safety regulations might exist.

Although the substance of 49 C.F.R. § 192.751 (1980) is not identical to that of the OSHA safety standard, the two are similar. In this regard, the Commission in *Texas Eastern* stated, that when 4(b)(1) preemption is at issue, whether the language of the preempting regulation parallels that of the OSHA standard is unimportant:

> Whether the OPS standards are the same or substantively different from the OSHA standards their content is of little moment. In Mushroom Transportation Co., Inc. No. 1588 (1974) we held that: "Once another Federal agency exercises its own authority over specific working conditions, OSHA cannot enforce its own regulations covering the same conditions. *Section 4(b)(1) does not require that another agency exercise its authority in the same manner or an equally stringent manner.*"

20 OSHRC at 717. (emphasis added by Commission) (Citations omitted). We therefore need not examine the substance of the preemptory regulation; as long as it covers the identical working conditions, OSHA's jurisdiction is preempted.

In holding that the pipeline regulations preempt OSHA's authority, we emphasize that petitioner's employees are not without safety regulations. Although the OSHA standards are preempted, the OPS regulations afford the workers protection from job site hazards. The existence of specific concurrent safety regulations distinguishes this case from the litany of Federal Railway Administration cases in which courts uni-formly found the OSHA standards as not preempted.[12] In those cases the creation of an industry wide exemption for the railroad, would, as the *Southern Railway* Court said: "leave thousands of workers in these non-operational areas of the railway industry exposed to unregulated industrial hazards ... [and] utterly frustrate the legislative purpose." *Southern Railway*, 539 F.2d at 338. Such a problem is not present in this case; only the working conditions of petitioner's employees—the "hot tap" of a pipeline transporting natural gas—are taken out of OSHA's jurisdiction by the OPS regulation.

■ Finally OSHA contends that even if this court interprets section 4(b)(1) as preempting OSHA's authority over the working conditions on Neville Island, petitioner failed to raise this issue at the administrative hearing and is therefore estopped to argue the question before this court. OSHA views section 4(b)(1) preemption as an affirmative defense that under Fed.R. Civ.Pro. 8(c) must be raised initially if it is to be considered on appeal. We disagree. Section 4(b)(1) preempts OSHA of subject matter jurisdiction once concurrent regulation is determined to cover the same working conditions. As such, a section 4(b)(1) claim can be raised initially on appeal or by the court *sua sponte*. 29 U.S.C. § 661(f) (1976); Fed.R.Civ.Pro. 12(h)(2). We appreciate, as the second circuit emphasized in *Marshall v. Northwest Orient Airlines, Inc.*, that preemption issues usually require "an inquiry into complex issues of law and fact" and that "it is proper for a court to defer examination of such difficult questions of agency jurisdiction until a party has fully exhausted its administrative remedies." 574 F.2d 119, 122 (2d Cir. 1978). But we see no reason to remand the case for a second hearing on the preemption question.[13] The

---

*Texas Eastern*, 20 OSAHRC 712, 715–16 (1975).

**12.** *See, e. g., Southern Railway*, 539 F.2d 335 (4th Cir.) *cert. denied*, 429 U.S. 999, 97 S.Ct. 525, 50 L.Ed.2d 609 (1976); *Southern Pacific Transportation Company v. Usery*, 539 F.2d 386 (5th Cir. 1976), *cert. denied*, 434 U.S. 874, 98 S.Ct. 222, 54 L.Ed.2d 154 (1977); *Baltimore and Ohio Railroad Company v. OSHRC*, 548 F.2d 1052 (D.C.Cir.1976).

**13.** Indeed, Columbia raised the section 4(b)(1) preemption issue before the Commission on a petition for discretionary review, but review

4(b)(1) preemption is clear; the exact working conditions at issue are covered by the OPS regulation. Therefore we vacate the citation for violation of 29 C.F.R. 1926.-651(v) and the final order of the Commission affirming that citation.

was denied. Since the Commission had an opportunity to address the question and declined review, any administrative exhaustion requirements have been complied with. As this court stated in *Universal Auto Radiator Mfg. v. Marshall:*

> The exhaustion requirement was adopted due to our concern for the orderly handling of proceedings before administrative agencies. We concluded that administrative authorities must be provided an opportunity to

review the actions of the ALJs in light of the objections of the parties before those objections are presented to an appellate court.... In this case [the Commission declined discretionary review] the OSHRC members have considered the petitioner's contentions and found no need for further review. Thus the concern in *Keystone Roofing* [that of administrative exhaustion] has been complied with in this case.

*Id.* 631 F.2d 20 (3d Cir. 1980).