**Ray MARSHALL, Secretary of Labor, United States Department of Labor**

v.

**Lee NICHOLS.**

**Civ. A. No. S–79–67–CA.**

United States District Court, E. D. Texas, Sherman Division.

March 10, 1980.

Walter W. Christy, New Orleans, La., and William C. Chaney, Dallas, Tex., for defendant.

Robert A. Fitz, Sol., Dept. of Labor, Dallas, Tex., for plaintiff.

## MEMORANDUM OPINION AND ORDER

ROBERT M. PARKER, District Judge.

This lawsuit arises out of an explosion on a Penrod Drilling Company platform in the Gulf of Mexico. The well blowout occurred on March 5, 1979, and the drilling platform was situated at Block No. 281, a lease maintained by Placid Oil Company.

The lease in question was sold to Placid Oil by the Secretary of the Interior, after Placid Oil had complied with the extensive

regulations of the Department of the Interior which govern the exploration of oil and gas deposits beneath the Outer Continental Shelf. See, generally, *Union Oil Company v. Morton*, 512 F.2d 743, 747 (9th Cir. 1975). Following issuance of this lease, Placid Oil contracted with Penrod Drilling for the performance of well drilling at Block No. 281, and during the course of drilling operations on Penrod Rig No. 30, a blowout and fire occurred on the platform. The fire and explosion killed several persons employed on the platform.

After the accident the Coast Guard and the United States Geological Survey conducted an investigation, and an initial hearing was held March 12–14, 1979. A representative of the plaintiff governmental agency, Occupational Safety and Health Administration, attended the hearings but did not participate. During the first phase of the Coast Guard and United States Geological Survey investigation, the cause of the accident and the safety precautions on Rig No. 30, both prior to and following the explosion, were issues upon which evidence was received. Subsequent hearings were conducted by the Coast Guard and the United States Geological Survey during June-July, 1979.

On March 14, 1979, plaintiff announced an intention to investigate the working conditions of Placid Oil's platform prior to the accident and obtained a warrant on March 16, 1979, to inspect Placid Oil's Houma, Louisiana, office. On motion of the plaintiff this inspection warrant was recalled, whereupon plaintiff issued administrative subpoenas compelling employees of Placid Oil Company and Penrod Drilling to testify at OSHA proceedings. Defendant, an employee of Penrod Drilling, refused to testify, and plaintiff filed this lawsuit to enforce the dishonored administrative subpoena.

Plaintiff has moved for summary judgment, seeking an order from this Court compelling defendant to testify in compliance with the administrative subpoena.

The defendant has filed a motion for summary judgment under Rule 56, F.R. Civ.P., which asks the Court to dismiss plaintiff's complaint. In support of his motion, defendant has filed with the Court affidavits of Lawrence Abbot, Van Kojis, Walter Christy, and Richard Ford, as well as, the transcript of a hearing held on plaintiff's motion for summary judgment in *Marshall v. Van Kojis* (E.D.La.1979), a companion case arising out of the same facts and involving identical legal issues.

Defendant has moved for summary judgment on the ground that issuance of the administrative subpoenas was beyond the statutory authority of plaintiff agency.

Plaintiff opposes defendant's motion for summary judgment, contending that investigations of offshore drilling operations are within the power of OSHA.

The Outer Continental Shelf Lands Act provides that the United States District Courts shall have original jurisdiction of cases in controversy arising out of any drilling operations conducted on the Outer Continental Shelf. 43 U.S.C. § 1349(b)(1).

The Outer Continental Shelf Lands Act sets up an extensive scheme for federal regulation of working conditions on offshore drilling platforms; and pursuant to this statutory authority, both the Coast Guard and the United States Geological Survey have enacted and enforced safety rules regarding offshore drilling. In setting up this regulatory sphere, Congress announced an intention that the Coast Guard and the United States Geological Survey are to promulgate and enforce regulations to insure that offshore drilling operations are ". . . conducted in a safe manner . . . [in order to minimize the likelihood of occurrences which] endanger life or health." 43 U.S.C. § 1332(6).

When the federal government executes a lease of offshore lands for the purpose of drilling operations to be conducted by the lessee, the Department of Interior has power to issue regulations concerning production operations to be carried out. 30 C.F.R. § 250.11. The United States Geological Survey, an agency under the Department of Interior, inspects and regulates offshore drilling operations with the specific purpose

of seeking to prevent injury to life or property. Under the provisions of the Outer Continental Shelf Lands Act, an offshore lease is issued and maintained under the supervision of the United States Geological Survey.[1]

The United States Geological Survey has developed and currently enforces safety regulations governing working conditions on drilling platforms in the Outer Continental Shelf.

The general policy of the Outer Continental Shelf Lands Act is that offshore drilling operations are to be conducted in a safe manner in order to minimize dangers to workers and the environment that result from blowouts. These policies are followed by the Interior Department and the United States Geological Survey in promulgation of regulations governing drilling and issuance of leases. *Pauley Petroleum, Inc. v. United States*, 591 F.2d 1308, 1323 (Court of Claims 1979). Orders specifying blowout prevention equipment to be installed on platforms, procedures to be taken upon occurrence of a blowout, safety equipment installation on drilling rigs, and mandatory safety training for personnel on offshore platforms have been issued by the United States Geological Survey. See, generally, 30 C.F.R. §§ 250.11, 250.12. Pursuant to the authority granted by the Outer Continental Shelf Lands Act, the Interior Department has promulgated the following regulation:

The lessee shall perform all operations in a safe and workmanlike manner and shall maintain equipment for the protection of the lease and its improvements, for the health and safety of all persons, and for the preservation and conservation of the property and the environment. The lessee shall take all necessary precautions to prevent and shall immediately remove any hazardous oil and gas accumulations or other health, safety or fire hazards. 30 C.F.R. § 250.46 ("Workmanlike Operations").

All of these regulations relate directly to safety and the prevention of well blowouts. Prior to commencement of drilling operations at Block No. 281, Placid Oil complied with all platform and safety design standards of the United States Geological Survey, and the United States Geological Survey approved Placid Oil's proposed operational plans. The drilling operations on this platform prior to March 5, 1979, were conducted in compliance with regulations promulgated by the United States Geological Survey and the Interior Department.

▆▆▆▆ Pursuant to the authority granted by Congress in 43 U.S.C. § 1333(d)(1), the Coast Guard has promulgated and issued regulations governing the safety and health of persons employed on artificial islands. 33 C.F.R. § 140.01–5. On the subject of platform design as it relates to employee safety, the Coast Guard has enacted the following regulations:

(a) Manned platforms shall be provided with at least two 'primary means of escape' extending from the uppermost platform level that contains living quarters or that personnel occupy continuously, to each successive lower working level and to the water surface. Working levels without living quarters, shops, or offices in manned platform structural appendages, extensions, and installations that personnel occupy only occasionally shall be provided with one 'primary means of escape' and, when necessary in the opinion of the Officer in Charge, Marine Inspection, one or more 'secondary means of escape.'

(b) Unmanned platforms shall be provided with at least one 'primary means of escape' extending from the uppermost platform working level to each successively lower working level and to the water surface. When personnel are on board, unmanned platforms shall also be provided with one or more 'secondary means of escape,' but not more than one

---

1. On January 26, 1979, Placid Oil and Penrod Drilling were fined by the United States Geological Survey because conditions hazardous to the employees were found to be in existence on the platform in question. Following directives issued by the United States Geological Survey, the conditions were corrected.

will be required for every 10 persons extending from the uppermost working level of the platform to each successively lower working level and to the water surface, excluding platform appendages and installations, unless 'secondary means of escape' from such appendages and installations are necessary in the opinion of the Officer in Charge, Marine Inspection. 33 C.F.R. § 143.05–5 ("Means of Escape—Numbers and Type Required").

(a) Except for helicopter landing decks which are provided for in paragraph (b) of this section, and areas not normally occupied, the unprotected perimeter of all floor or deck areas and openings shall be rimmed with guards and rails or wire mesh fence. The guard rail or fence shall be at least 42 inches high. The two intermediate rails shall be so placed that the rails are approximately evenly spaced between the guard rail and the floor or deck area: *Provided,* That if a toe board is installed then one of the intermediate rails may be omitted and the other rail placed approximately half way between the top of the toe board and the top guard rail.

(b) The unprotected perimeter of the helicopter landing deck shall be protected with a device of sufficient strength and size as to prevent any person from falling from such deck. 33 C.F.R. § 143–15 ("Guards and Rails—Floor or deck areas and openings").

Coast Guard regulations relating to lifesaving equipment, firefighting devices, and escape procedures in the event of an emergency were in effect and governed the working conditions on Rig No. 30 prior to the March 5, 1979, explosion. Actual exercise of authority to govern working conditions by the Coast Guard displaces a poten-

tial OSHA jurisdiction over offshore platform working conditions. *Clary v. Ocean Drilling and Exploration Company,* 609 F.2d 1120 (5th Cir. 1980).

The United States Geological Survey's investigation following the accident centered on working conditions on Rig No. 30 prior to the explosion; also examined were design of the platform, normal employee precautions and working procedures, and safety procedures followed after the incident.[2]

Plaintiff's contention that only post accident safety procedures were investigated by the Coast Guard ignores the fact that both the Coast Guard and the United States Geological Survey have participated in the investigations undertaken. Inquiry into the cause of the explosion, working conditions on the rig prior to the explosion, and design of the platform has been made by both the Coast Guard and the United States Geological Survey; additionally, the rescue and safety efforts following the explosion were matters undertaken at the public hearings. The information requested by plaintiff emphasizes the duplication that would occur if the Court were to grant enforcement to the administrative subpoena issued to defendant.[3] It is this type of duplication of investigation into employee working conditions that Congress sought to prevent when it granted authority to OSHA to issue and enforce regulations pertaining to safe working conditions. *Marshall v. Northwest Orient Airlines,* 574 F.2d 119, 124 (2nd Cir. 1978).

The regulations issued and enforced by the United States Geological Survey, the Interior Department, and the Coast Guard govern the employment relationship on offshore platforms in its entirety. Regulations concerning every conceivable hazard en-

2. Following an explosion on an offshore drilling platform, it is the duty of the Secretary of the Interior to implement new plans and procedures to be applicable to the particular platform in the future, and these plans must be ". . . different from those followed prior to the blowout to assure that such disasters would not occur." *Sun Oil Co. v. United States,* 572 F.2d 786, 805 (Court of Claims 1978).

3. Plaintiff has requested that defendant provide the names of employees on the platform at the time of the accident, a description of the accident, drilling progress reports, the written occupational safety and health program, and the diagram of the platform. Defendant denied plaintiff access to this information when it dishonored the administrative subpoena.

countered by persons employed on offshore platforms have been promulgated. In enacting the Outer Continental Shelf Lands Act, Congress intended to exclude from OSHA inspection and administrative review the working conditions on offshore drilling platforms. *Clary v. ODECO, supra; Southern Pacific Transportation Company v. Usery,* 539 F.2d 386, 390 (5th Cir. 1976), cert. denied, 434 U.S. 874, 98 S.Ct. 221, 222, 54 L.Ed.2d 154 (1977). The present case does not present a hypothetical conflict of regulations promulgated by different administrative agencies. Actual exercise of statutory authority to regulate working conditions on offshore platforms by the Interior Department and the Coast Guard forecloses authority of the Secretary of Labor to prescribe labor standards on offshore drilling platforms. *Southern Ry. Co. v. Occupational Safety and Health Review Commission,* 539 F.2d 335, 337 (4th Cir. 1976); *Clary v. ODECO, supra.*

■ The Court has failed to find any OSHA regulations pertaining to the oil well drilling industry. Plaintiff contends that its investigation is authorized by 29 U.S.C. § 654(a)(2) which obligates employers to comply with occupational health and safety standards promulgated by OSHA. OSHA contends that the entire oil well drilling industry is governed by OSHA construction regulations. While rulings and opinions of OSHA concerning the scope of its promulgated regulations are to be considered, *Skidmore v. Swift & Co.,* 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944), such opinions are not controlling where an agency seeks to go beyond the rulemaking authority granted by the Administrative Procedure Act.[4] The absence of any participation by the oil well drilling industry in

promulgation of general construction regulations prevents OSHA from applying such regulations in the present case. *U. S. v. Frontier Airlines,* 563 F.2d 1008, 1012 (10th Cir. 1977).

Presumably, plaintiff seeks to obtain the plans relating to platform design, safety equipment, various working procedures, and personnel operational training that were submitted by Placid Oil to the Department of Interior prior to issuance of the drilling permit. The Court believes that it is plaintiff's intention to determine whether the plans issued by Placid prior to commencement of operations complied with OSHA's construction industry regulations. An investigation of this type would violate the requirement of industry participation in development of agency standards. *H-30, Inc. v. Marshall,* 597 F.2d 234 (10th Cir. 1979); 5 U.S.C. § 553(c). The Court notes that in addition to compliance with occupational safety standards of the United States Geological Survey prior to any drilling, operations were maintained in compliance with United States Geological Survey standards via regular surprise inspections conducted by the United States Geological Survey.

■ The position of the plaintiff that investigations by the Coast Guard, similar to an open court of inquiry, with the right to counsel, right to cross examination, and the right to call witnesses, are not compatible with OSHA investigations, similar to closed grand jury proceedings, misses the issue of OSHA authority to issue the administrative subpoena to defendant. The Court is of the opinion that *Clary v. ODECO, supra,* established that OSHA regulations do not apply to working conditions of seamen on offshore drilling platforms.[5]

4. Indeed, the federal judiciary possesses ". . . a peculiar expertise in statutory interpretation . . ." in consideration of the issue of statutory authority for proposed administrative agency regulation and investigation. *Ralpho v. Bell,* 569 F.2d 607, 623 (D.C. Cir.1977).

5. *Clary v. ODECO* was a personal injury lawsuit brought by the plaintiff under the Jones Act. Plaintiff alleged that defendant's unseaworthy vessel and negligence caused injuries

plaintiff received while working aboard a submersible drilling barge on the Outer Continental Shelf. During trial on the merits, Senior District Judge Putman excluded from the jury's consideration safety standards promulgated by OSHA, and the Court overruled plaintiff's requested special jury charge ". . . that the failure to color code the retaining wall yellow as a stumbling hazard was a violation of a safety statute [OSHA Safety Regulation, 29

Both the Coast Guard and the United States Geological Survey have promulgated and enforced health and safety regulations governing working conditions on offshore platforms; therefore, 29 U.S.C. § 653(b)(1) prevents any attempt by OSHA to assert jurisdiction over working conditions on the Outer Continental Shelf, regardless of any procedural and substantive rights that would not be given to an employer in an investigation conducted by OSHA. The Court rejects plaintiff's contention that the hearings and investigations conducted by the Coast Guard and the United States Geological Survey following the incident were not concerned with working conditions and events prior to the March 5, 1979, explosion.

■ Plaintiff contends that defendant may not raise defenses to enforcement of its administrative subpoena because defendant has not exhausted its administrative remedies. The exhaustion of administrative remedies doctrine prevents judicial review of factual issues pending before an administrative agency until the matters have been disposed of administratively. The requirement of exhaustion of remedies is a decision within the Court's discretion, *NLRB v. Marine Workers*, 391 U.S. 418, 426, 88 S.Ct. 1717, 1722–1723, 20 L.Ed.2d 706 (1968); the doctrine is subject to numerous exceptions. *McKart v. U. S.*, 395 U.S. 185, 193, 89 S.Ct. 1657, 1662, 23 L.Ed.2d 194 (1968). Whether the exhaustion of remedies doctrine should be applied in a particular case depends upon an analysis of the policies underlying the exhaustion doctrine and of the particular administrative scheme involved. *Hardy v. Leonard*, 377 F.Supp. 831, 837 (N.D.Cal.1974).

■ Plaintiff has the burden of demonstrating that it is acting within its statutory authority in seeking enforcement of its administrative subpoena. *Securities and Exchange Commission v. Brigadoon Scotch Distributing Co.*, 480 F.2d 1047, 1053–1054 (2nd Cir. 1973).

■ The basic purpose of requiring exhaustion of administrative remedies prior to judicial proceedings is to allow the administrative agency to make a factual record and apply its expertise, as well as, allow the agency an opportunity to correct its own errors as to moot judicial controversies. *Parisi v. Davidson*, 405 U.S. 34, 37, 92 S.Ct. 815, 817, 31 L.Ed.2d 17 (1971). In denying enforcement to the administrative subpoena issued by OSHA and granting defendant's motion for summary judgment, the Court is not disposing of factual issues before OSHA has had an opportunity to dispose of the matters administratively; rather, the Court is of the opinion that plaintiff does not have jurisdiction or authority to investigate the March 5, 1979, offshore accident.

Both the Coast Guard and Department of Interior have prescribed regulations governing working conditions for offshore drilling platforms. This fact alone prevents the Court from granting judicial enforcement to the administrative subpoena issued by the plaintiff. 29 U.S.C. § 653(b)(1). Clearly OSHA acted beyond the statutory authority granted to it by the Occupational Safety and Health Act when the administrative subpoena was issued to plaintiff; the exhaustion of administrative remedies doctrine is inapplicable to the present case. *Leedom v. Kyne*, 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958). OSHA acted contrary to the specific prohibition contained in 29 U.S.C. § 653(b)(1), and under the *Leedom v. Kyne* exception, this Court has the power to deny enforcement of the plaintiff's administrative subpoena. *Boire v. Greyhound Corp.*, 376 U.S. 473, 480, 84 S.Ct. 894, 898, 11 L.Ed.2d 849 (1964).

C.F.R. § 1910.144(a)(3)], constituting negligence per se . . . ." *Clary v. ODECO*, 429 F.Supp. 905, 907 (W.D.La.1977). Following an adverse jury verdict, plaintiff moved for a new trial, alleging the Court committed error in excluding OSHA standards. The Court denied plaintiff's motion and issued a memorandum opinion concluding that ". . . crew members of vessels are excepted . . . ." from

safety regulations promulgated by the Secretary of Labor. *Id.*, p. 908.

On appeal, Circuit Judge Roney analyzed the case law on displacement of OSHA authority, and the Fifth Circuit ruled ". . . that the Occupational Safety and Health Act (OSHA), 29 U.S.C.A. § 651 et seq., does not apply to the working conditions of seamen on vessels operating on the high seas." *Supra*, at p. 1121.

There is no genuine issue as to any material fact in this dispute. Only a legal issue has been presented to the Court, and the Court is convinced that there is no viable legal theory which would entitle the plaintiff to have its administrative subpoena enforced. The defendant's motion for summary judgment is granted, and the Court denies enforcement of plaintiff's administrative subpoena. See, generally, 6 Moore, *Federal Practice*, § 5616, at p. 56–661 (1979).

The Court directs all counsel to submit a proposed form of final judgment on or before March 17, 1980. See, 3A Frumer and Hall, *Bender's Federal Practice Forms*, Form No. 3296, at p. 512.25 (1979).

The Court has been concerned by defendant's allegation that plaintiff brought this lawsuit in bad faith and for politically motivated purposes. For a long period of time both the federal courts and Congress have been aware of the risks associated with the exploration and development of offshore petroleum deposits. Congress enacted the Outer Continental Shelf Lands Act, and amendments thereto, for the specific purpose of ensuring that all offshore drilling operations are conducted in the safest possible manner; and, the federal judiciary has reformed, and continues to modify, the principles of admiralty law in order to promote the safety of persons employed on offshore drilling platforms. *Rodrigue v. Aetna Casualty*, 395 U.S. 352, 355, 89 S.Ct. 1835, 1836–1837, 23 L.Ed.2d 360 (1969). This Court is convinced that the legal community must assume a role of leadership in the nation's struggle to develop solutions to the energy crisis the country faces. See, for example, Gambrell, *Invention and Innovation Incentives to Meet the Energy Crisis: Playing It Safe Is Too Risky*, 16 Houston L.Rev. 365 (1979). In this lawsuit the conduct of the plaintiff has not conformed to this policy; the Court is persuaded that the plaintiff oppressively commenced and prosecuted this action in order to harass the defendant.

This Court possesses the power to award counsel fees to a successful party when his opponent's conduct in the litigation has been marked by bad faith; attorney's fees are properly assessed where oppressive reasons led to the commencement of the lawsuit. *Hall v. Cole*, 412 U.S. 1, 14, 93 S.Ct. 1943, 1950–1951, 36 L.Ed.2d 702 (1973).

The Court finds that this lawsuit was not brought in good faith, and an executive branch violation which amounts to bureaucratic abuse of *Rodrigue v. Aetna Casualty, supra*, and *Clary v. ODECO, supra*, has resulted in this action's maintenance and prosecution. The Court exercises its discretionary authority and orders plaintiff to pay to the defendant the reasonable attorney's fees which have been incurred in defense of this lawsuit.

The Court has scheduled a hearing on the remaining issue of reasonable counsel fees for 8:30 a. m., March 20, 1980, in Federal District Court in Beaumont, Texas. The Court will hear argument from counsel on the guidelines set out in *Kerr v. Screen Extras Guild*, 526 F.2d 67, 69–70 (9th Cir. 1975).